MICHELE BECKWITH
Acting United States Attorney
ROBERT ABENDROTH
Assistant United States Attorney

    United States Attorney's Office
    501 I Street, Suite 10-100
    Sacramento, CA. 95814
    Telephone: (916) 554-2700

KATHLEEN WOLFE
Acting Assistant Attorney General, Civil Rights Division
CHRISTOPHER J. PERRAS
Special Litigation Counsel
SAMUEL KUHN
Trial Attorney

    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, DC 20530
    Telephone: (202) 514-3847

SUE BAI
Supervisory Official, National Security Division
JACOB WARREN
PATRICK CASHMAN
Trial Attorneys

    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, DC 20530
    Telephone: (202) 514-2007

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DALLAS ERIN HUMBER, and<br>MATTHEW ROBERT ALLISON,<br><br>    Defendants. | CASE NO. 2:24-CR-00257-DC<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT ALLISON'S MOTION FOR BAIL REVIEW<br><br>**EXHIBITS FILED UNDER SEAL** |

1

The United States of America, by and through the undersigned attorneys, hereby opposes Defendant Matthew Allison's Motion for Bail Review. ECF 42.  Defendant Allison should continue to be detained pending trial for the reasons set forth in the government's Motion for Detention (ECF 11): (1) he is a leader of a transnational terrorist group charged with soliciting bias-motivated mass-shootings, political assassinations, and terrorist attacks on critical infrastructure—serious crimes that warrant detention to protect public safety and national security; (2) he is charged with a federal crime of terrorism —conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count 15)— which carries a presumption of detention under § 3142(e)(3)(C); (3) he is a significant flight risk: his sentencing exposure (life in prison) gives him a powerful incentive to flee, and his risk of flight is compounded by the minimal connections he has to his community and his ties to a domestic and international network of terrorists upon whom he may rely to flee and conceal his whereabouts; (4) he poses a grave danger to the community: he has incited terrorist attacks domestically and abroad, he knows how to make improvised explosive devices, and he has advised other members of the Terrorgram Collective that if federal agents try to arrest them, they should "go down fucking shooting"; (5)  he has discussed with other members of the Terrorgram Collective destroying evidence and retaliating against informants; and (6) no combination of conditions would mitigate the foregoing risks and dangers because all Defendant Allison needs is an internet connection to induce terrorist attacks, destroy evidence, and retaliate against witnesses; and because he has vowed to keep doing so until the day that he dies, thus creating "an unacceptably high risk that [he] would not comply in good faith with the proposed conditions, or any other combination of release conditions, imposed upon [him]." *United States v. Hir*, 517 F.3d 1081, 1093 (9th Cir. 2008).  Furthermore, evidence discovered after the filing of the government's motion for detention supplies three additional bases to detain Defendant Allison pending trial: (7) a private group chat found on Defendant Humber's cellphone proves that Defendant Allison and three others created The List; (8) evidence seized from Defendant Allison's storage unit and cellphone ████████████ ████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████; and (9) jail calls between Defendant Allison and his father raise doubts about his father's suitability as a third-party custodian.  For all of those reasons, detailed further below, Defendant Allison should be detained pending trial.

## I. INTRODUCTION

Rather than restate the legal standard and bases for detention outlined in the government's motion for detention (ECF 11), which this pleading incorporates by reference, the United States will use this Opposition to address the newly discovered evidence, the arguments raised in Defendant Allison's Motion for Bail Review (ECF 42), and the questions raised by the Court at Monday's detention hearing, which was continued until Friday, February 14, 2025. ECF 44.

## II. THE NEWLY DISCOVERED EVIDENCE

After the government filed its motion for detention (ECF 11), on September 10, 2024, federal authorities discovered additional evidence pertinent to the Court's decision whether to detain Defendant Allison pending trial.

### A. Private Group Chat, titled, "The List 2.0"

After Defendant Humber's arrest, federal authorities seized and searched her cellphone, pursuant to a warrant, and found a private group chat establishing that Defendant Allison, his co-defendant, and two unindicted co-conspirators came up with the idea to create what they initially called a "kill list" and "kill book" before they later shortened it to "The List." In that private group chat, they shared ideas for "high value targets" and worked together over years to turn their idea into a stylized publication, with each page, or "List card," featuring a different "high value target," including that target's name, photograph, and home address and the reasons why they were targeted for "assassination." Exhibit 1. As charged in the Indictment, the targets for assassination included a U.S. Senator, a former U.S. Attorney, and a sitting federal judge. ECF 1, at ¶9-15. This newly discovered evidence contradicts Defendant Allison's claim that he was not a "leader" of Terrorgram, *see* ECF 42, at 8, and adds to the weight of the evidence against him, a Bail Reform Act factor militating in favor of his detention, 18 U.S.C. § 3142(g)(2).

[redacted]

1 ██████████████████████████████████████████████████████████
2 ████████████████████████████████████████████████████████████████
3 ████████████████████████████████████████████ This newly discovered evidence,
coupled with evidence that Defendant Allison was arrested wearing a backpack containing lock-picking tools, gloves, a gun, zip ties, duct tape, a condom, and stuffed animals, further supports the government's position that Defendant Allison poses a danger to the community, 18 U.S.C. § 3142(g)(4).

### C. Jail Call with John Allison

Since Defendant Allison's arrest, he has spoken with his father, John Allison, on recorded jail phone calls, one of which raises doubts about his father's suitability as a third-party custodian.

During a call on September 13, 2024, Defendant Allison and his father discussed the crimes the Defendant is charged with committing in this case, which include soliciting hate crimes, soliciting the murder of federal officials, and providing material support to terrorism. Their discussion led to the following exchange:

- John Allison: "I've been thinking about doing the same thing for years, and now that you have been caught, it's like uh-oh, you know, they are going after everybody now, so I better stop doing what I'm doing."
- Matthew Allison: "What do you mean thinking of doing the same thing?"
- John Allison: "Well…I…theoretically." At which point he changed the subject.

Exhibit 5, at 23:30. It is not uncommon for a defendant's parents to express disbelief that their child is capable of committing the crimes with which he or she is charged. It *is* uncommon, and frankly, troubling, for a parent to express that he had been planning on doing the same thing.

The foregoing exchange calls into question John Allison's suitability as a third-party custodian charged with ensuring compliance with this Court's conditions of release.

### III. DEFENDANT ALLISON'S MOTION FOR BAIL REVIEW

The United States hereby responds to the five main arguments Defendant Allison raises in his Motion for Bail Review. ECF 42.

4

**A. Defendant Allison was a leader of the Terrorgram Collective**

First, Defendant Allison asserts that "there is nothing to support the government's view that Allison was a 'leader'" of the Terrorgram Collective. ECF 42, at 8.

As an initial matter, Defendant Allison does not appear to contest that he is a member of the Terrorgram Collective, and that the Terrorgram Collective is a terrorist group. Both allegations would be hard to contest. Defendant Allison admitted to federal authorities that he is a member of the Terrorgram Collective, and over the past year and a half, the governments of the United States, the United Kingdom, and Australia have officially designated the Terrorgram Collective as a terrorist group.

That Defendant Allison is a member of a transnational terrorist group responsible for mass-casualty attacks around the world, and that he is personally charged with soliciting violence and providing material support to terrorists, should be a sufficient basis to detain him pending trial, even if he were not a leader of that group. See ECF 11, at 8, fn5 (collecting cases).

But there is abundant evidence that Defendant Allison did more than simply participate in Telegram "channels and group chats"; he was a leader of the Terrorgram Collective during the time period charged in the Indictment. In the summer of 2022, after one of Terrorgram's previous leaders was arrested and another stepped away after becoming aware of a terrorism investigation against him, Defendant Allison and his co-defendant stepped in to fill the void in leadership. Defendants Allison and Humber took over as administrators of Terrorgram channels and group chats. Defendant Allison helped edit The Hard Reset, prepare it for publication, disseminate it, and publicize it. ECF 1, at ¶5-7. Defendant Allison then played a leading role in creating and disseminating the Terrorgram publications that came after The Hard Reset. Defendants Allison and Humber co-created White Terror. ECF 1, at ¶8. Defendants Allison and Humber collaborated with several "Artists of Terrorgram"—members responsible for design of Terrorgram publications—on The Saint Encyclopedia, which remained in progress at the time of their arrests. ECF 1, at ¶19-22. Defendants Allison and Humber, along with two unindicted co-conspirators, created The List, as detailed in Section II.A, *supra*. Defendant Allison personally administered The List channel and personally disseminated links to that channel at least 50 times in more than a dozen Terrorgram group chats. In short, though Defendant Allison did not hold an

5

1   official title, his conduct amply demonstrates that he and his co-defendant were two leaders of the
2   Terrorgram Collective during the time period charged in the Indictment.
3       But Defendant Allison did more than lead the Terrorgram Collective; he and his co-defendant had
4   one-on-one communications with teenage Terrorgram "Saints" before and even during their attacks.  Before
5   "Attacker 1" shot three people, killing two, at an LGBT bar in Bratislava, Slovakia, he sent his manifesto to
6   Defendant Allison so that Defendant Allison could disseminate it and glorify him as "Terrorgram's First
7   Saint." ECF 1, at ¶30.  Immediately after that attack, while Attacker 1 was on the run, he sent the following
8   direct messages to Defendant Allison: "not sure how much time i have but it's happening" and "just delete
9   all messages about this convo." Exhibit 6A.  On October 23, 2022, in a "secret chat" extracted from
10  Defendant Allison's cellphone, Defendant Humber told Defendant Allison that she had direct messages with
11  a Terrorgram user who was planning to commit a racially motivated school shooting. Exhibit 6B.  One
12  month later, the Terrorgram user carried it out, shooting fifteen people and killing four, all while wearing a
13  Siege mask—the same kind of mask found in Defendant Allison's duffel bag.

14              **B. Defendant Allison's Criminal Conduct is Not Protected by the First Amendment**

15      Second, Defendant Allison contends that he "appears to have a strong defense that his Telegram
16  communications are protected by the First Amendment." ECF 42, at 9.  As Defendant Allison
17  acknowledges, a motion for pretrial release is not the proper avenue to litigate legal defenses: "Mr.
18  Allison's defense that all his speech is protected by the First Amendment will ultimately be decided at a
19  later date by the district court or jury." *Id.* at 13.  It makes little sense for the Court to guess at whether
20  charges might be predicated on protected speech before the government has had the opportunity to
21  present evidence supporting those charges.  Nevertheless, because this argument implicates one Bail
22  Reform Act factor—weight of the evidence—the United States will briefly explain why the charged
23  offenses are not predicated on speech protected by the First Amendment.
24      First, "criminal solicitations"—the offenses charged in Counts Two through Eight of the
25  Indictment—"are simply not protected by the First Amendment." *United States v. White*, 698 F.3d 1005,
26  1016 (7th Cir. 2012) (explaining that since a "reasonable jury could have found that [defendant's] online
27  posts constituted 'a proposal to engage in illegal activity' and not merely 'the abstract advocacy of
28  illegality[,]' . . . the First Amendment provides no shelter for [his] criminal behavior"); *see also United*

6

*States v. McNeil*, 228 F. Supp. 3d 809, 814-17 (N.D. Ohio 2017) (denying motion to dismiss solicitation charges predicated on social media posts imploring followers to kill members of U.S. military).

Second, Defendant Allison's speech "[e]xhorting groups of followers to kill specific individuals" qualifies as a "true threat," and true threats, like criminal solicitations, are categorically exempt from First Amendment protection. *United States v. Wheeler*, 776 F.3d 736, 745 (10th Cir. 2015) ("Exhorting groups of followers to kill specific individuals can produce fear in a recipient no less than more traditional forms of threats. Allowing defendants to seek refuge in the First Amendment simply by phrasing threats as exhortations would, as the *Turner* court observed, leave the state 'powerless against the ingenuity of threateners.'"); *see also United States v. Turner*, 720 F.3d 411, 413–14 (2d Cir. 2013) (rejecting First Amendment challenge to threats conviction, explaining: "Turner did not merely advocate law violation or express an abstract desire for the deaths of Judges Easterbrook, Bauer, and Posner. He posted photographs, work addresses and room numbers for each of the judges, along with a map and photograph of the courthouse").

In addition to soliciting Terrorgram users to commit hate crimes, Defendant Allison created a detailed "hit list" targeting "high value targets" for "assassination," and disseminated that hit list to violent extremists with the exhortation to "take action" and "do your part." That is not protected speech. The Ninth Circuit, sitting *en banc*, ruled that a similar hit list—"wanted" posters featuring the names and faces of so-called abortionists—was not protected speech. *See Planned Parenthood v. Am. Coal. of Life Activists* ("PPCW"), 290 F.3d 1058, 1085 (9th Cir. 2002) (en banc). Defendant Allison's List cards share several pertinent features of the "wanted" posters in PPCW. Both "connote something they do not literally say" but have an unmistakable message: "You'll be shot or killed." *Id.* Both were distributed to groups, rather than to individuals, but were "personally targeted." *Id.* at 1086. Both were distributed to audiences that included violent extremists whom the distributors had reason to believe would attack the identified targets—indeed, that was the whole point: to induce others to kill their enemies. *Id.* Since "[v]iolence is not a protected value" and hit lists do not "stak[e] out a position of debate but of threatened demise," they are not protected by the First Amendment. *Id.*

Nor are manuals providing detailed instructions for how to commit murder and terrorist attacks. The Terrorgram publications created and disseminated by Defendant Allison are "the archetypal example

7

of speech which, because it methodically and comprehensively prepares and steels its audience to specific criminal conduct through exhaustively detailed instructions on the planning, commission, and concealment of criminal conduct, finds no preserve in the First Amendment." *Rice v. Paladin Enter., Inc.*, 128 F.3d 233, 249-50, 265-66 (4th Cir. 1997) (explaining that "detailed instructional books, similar to *Hit Man*, which are devoted exclusively to teaching the techniques of violent activities that are criminal per se" are not protected speech, and that "the murder instructions in *Hit Man* are, collectively, a textbook example of the type of speech that the Supreme Court has quite purposely left unprotected, and the prosecution of which, criminally or civilly, has historically been thought subject to few, if any, First Amendment constraints"); *United States v. Barnett*, 667 F.2d 835, 842–43 (9th Cir. 1982) (affirming defendant's conviction for making a PCP instruction manual: "To the extent . . . that Barnett appears to contend that he is immune from search or prosecution because he uses the printed word in encouraging and counseling others in the commission of a crime, we hold expressly that the first amendment does not provide a defense as a matter of law to such conduct."); *United States v. Mustafa*, 406 F. App'x 526, 530 (2d Cir. 2011) (ruling that the First Amendment does not protect "knowingly providing jihad training and disseminating training manuals on the Internet for the benefit of al Qaeda, and other terrorist organizations").  As a leading constitutional scholar put it: "[T]he law need not treat differently the crime of one man who sells a bomb to terrorists and that of another who publishes an instructional manual for terrorists on how to build their own bombs out of old Volkswagen parts." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 837 (2d ed. 1988).

As the foregoing doctrines make clear, speech qualifying as criminal solicitation, criminal instruction, or a true threat is categorically exempt from First Amendment protection, so it need not pass the *Brandenburg* "incitement" standard to qualify as unprotected speech. *See United States v. Bell*, 414 F.3d 474, 482 n.8 (3d Cir. 2005) ("*Brandenburg* clearly does not apply to the kind of unprotected or unlawful speech or speech-acts (e.g., aiding and abetting, extortion, criminal solicitation, conspiracy, harassment, or fighting words) at issue in *Paladin* and here."); *Rice*, 128 F.3d at 246 (pointing out that "the law is now well established that the First Amendment, and *Brandenburg*'s 'imminence' requirement in particular, generally poses little obstacle to the punishment of speech" that falls within other categories of unprotected speech).

Although the government is not required to satisfy the *Brandenburg* "incitement" test to survive constitutional scrutiny, the government respectfully submits that the evidence presented at trial will satisfy that standard. In *Brandenburg v. Ohio*, 395 U.S. 444, 445-46 (1969), the Supreme Court overturned the conviction of a Ku Klux Klan leader for making a racially derogatory speech and warning that if the government "continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken." The Court distinguished "the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence," which is protected speech, from "preparing a group for violent action and steeling it to such action," which is not. *Id.* at 448. The evidence at trial will establish that Defendants Allison and Humber were not engaged in mere abstract advocacy; they were preparing members of the Terrorgram Collective to commit terrorist attacks, arming them with the weapons and knowledge necessary to carry them out, and steeling them to take imminent action. Several did, and innocent people died as a result. As the Ninth Circuit put it: "We recognize that the freedoms to speak and assemble which are enshrined in the First Amendment are of the utmost importance in maintaining a truly free society. Nevertheless, it would be cavalier to assert that the government and its citizens cannot act, but must sit quietly and wait until they are actually physically injured or have had their property destroyed by those who are trying to perpetrate, or cause the perpetration of, those violent outrages against them." *United States v. Rundo*, 990 F.3d 709, 721 (9th Cir. 2021) (reversing district court's pretrial order to dismiss on First Amendment grounds).

For all of these reasons, the United States respectfully submits that Defendant Allison's speech and conduct is not protected by the First Amendment, and that the weight of the evidence against him militates in favor of detention.

**C. Defendant Allison Poses a Danger to the Community**

Third, Defendant Allison claims that he is a "warm and friendly" person who "poses no danger to any person or the community." ECF 42, at 13-14.

That assertion is belied by the evidence. Defendant Allison has spent years online urging others to murder innocent victims and commit terrorist attacks. To the extent Defendant Allison is suggesting that his online persona does not reflect who he really is, the problem with that argument is that his offline persona is not much better. Defendant Allison's own brother acknowledged to the government that

9

Defendant Allison enjoyed watching "graphic violent material," including "videos and images videos of beheadings," from the time that he was 10 years old (and, it is worth noting, in the custody of his father, his requested third-party custodian). Exhibit 7. Over the years, Defendant Allison's fascination with murder ███████████ have only grown stronger, as established by ███████████ ███████████████████████████████████████ see Section II.B, *supra*, and the items found in his backpack, addressed below, which indicate his intent to act on them.

### D. The Evidence Against Defendant Allison Speaks for Itself

Fourth, Defendant Allison accuses the government of "mischaracterizing evidence against him." ECF 42, at 14-15. In particular, he asserts that there is "no evidence" that any of the items in the backpack seized from his person or in the duffel bag seized from his apartment were "intended for any unlawful purpose." *Id.* The government respectfully submits that the evidence speaks for itself.

The backpack that Defendant Allison was wearing when he was arrested contained lock-picking tools, gloves, a loaded gun, ammunition, zip ties, duct tape, a condom, and stuffed animals. Exhibit 8. The government stands by its observation that such items could "be used to break into a house or building, tie up innocent victims, and hurt or kill them." ECF 11, at 19. The government's observation is corroborated by the newly discovered evidence found on Defendant Allison's devices and in his storage unit, *see* Section II.B *supra*—evidence of his disturbing fascination with sexual violence and murder. That Defendant Allison fantasizes about murdering babies, raping women, and using boys as sex slaves, and was caught leaving his house with a backpack containing supplies necessary to commit those crimes, is relevant evidence this Court should consider in evaluating whether the Defendant poses a danger to the community.

The duffel bag seized from Defendant Allison's apartment contained a passport,[1] a birth certificate, $1500 in cash, clothing, a thumb drive, and pills. Exhibit 9. It is not unusual for a person to have each of those items, but it *is* unusual for a person to store them together in a single bag. The logical reason to do so is to be able to grab them and go at a moment's notice. To be clear, there is nothing

---

[1] Defense counsel argues that the passport is irrelevant because it "had long been expired." ECF 42, at 15. But as Defendant Allison pointed out during a recorded jail call with his father, on November 20, 2024, you do not "need a passport to *leave* the country. You need a passport to *get back in* to the country."

10

unlawful about having a go-bag, but it is certainly something the Court may consider in evaluating a defendant's risk of flight.

Just as Defendant Allison's possession of a Siege mask—also found in the duffle bag—is something the Court may consider in evaluating Defendant Allison's danger to the community. A Siege mask is more than just a face-covering; it is a symbol of militant accelerationism[2] and an item of clothing frequently worn by militant accelerationists during mass shootings. Many Terrorgram "Saints" wore Siege masks when they carried out their attacks, as did "Attacker 3" (ECF 1, at ¶32)—and Defendant Allison encouraged Terrorgram users to do so when he posted things like "Grab Your Skull Mask & Accelerate." Exhibit 10.

**E. Defendant Allison's Requested Pretrial Delays Should Not Earn Him Pretrial Release**

Fifth, Defendant Allison argues that the anticipated "lengthy period of pretrial detention that is needed to adequately prepare for trial raises serious constitutional issues and is another factor favoring pretrial release." ECF 42, at 17-18.

For the sake of clarity, the constitutional provision at issue is the due process clause, which is violated by a period of pretrial detention so "excessively prolonged" that it becomes "punitive." *United States v. Salerno*, 481 U.S. 739, 747 n.4 (1987); *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021).

Defendant Allison cites *Salerno* and *Torres*, but omits a key component of the multifactor test: whether the prosecution is responsible for the pretrial delay. *See Torres*, 995 F.3d at 708 ("[I]n evaluating whether a due process violation has occurred, we weigh the following factors: (1) the length of the defendant's pretrial detention; (2) *the prosecution's contribution to the delay*; and (3) the evidence supporting detention under the Bail Reform Act.") (emphasis added). In *Torres*, the Ninth Circuit found no due process violation, despite a 21-month period of pretrial detention, in part because "the prosecution bears no responsibility for the delay in his case," as "[t]he first two continuances were stipulated to for the benefit of Torres's counsel to adequately prepare his case"). *Id.* at 708-09. Since

---

[2] See H.E. Upchurch, *The Iron March Forum and the Evolution of the "Skull Mask" Neo-Fascist Network*, COMBATING TERRORISM CENTER AT WEST POINT, SENTINEL Volume 14, Issue 10, at 27 (Dec. 2021), *available at* https://ctc.westpoint.edu/the-iron-march-forum-and-the-evolution-of-the-skull-mask-neo-fascist-network/; Matthew Kriner, Erica Barbarossa, Isabela Bernardo & Michael Broschowitz, *Behind the Skull Mask: An Overview of Militant Accelerationism*, GLOBAL NETWORK ON EXTREMISM AND TECH., at 19 (Mar. 2024), *available at* https://doi.org/10.18742/pub01-171.

11

*Torres*, the Ninth Circuit has ruled that even a *six-year* period of pretrial detention did not violate the due process clause, on plain error review, in part because the delay was attributable to the defendant, who "substituted counsel multiple times and stipulated to almost all the continuances." *United States v. Molina*, No. 22-50244, 2024 WL 4616203, at *3 (9th Cir. Oct. 30, 2024); *see also United States v. Hemsley*, No. 2:13-CR-300-GEB, 2018 WL 2441588, at *3 (E.D. Cal. May 31, 2018) (denying pretrial release where "government [wa]s not responsible for the pretrial delay" because the defendant agreed to his co-defendant's continuance request and otherwise stipulated to continue the briefing schedule).

Factoring in whether the prosecution is responsible for the pretrial delay makes good sense: it incentivizes the government to expedite trial preparations for detained defendants, and it removes the incentive for a detained defendant to ask for repeated continuances and thereby obtain a windfall of pretrial release to which he was not otherwise entitled. Just as "[a] defendant cannot simply manufacture a breakdown in communication and thereby give rise to a constitutional violation," *Romero v. Furlong*, 215 F.3d 1107, 1114 (10th Cir. 2000), a defendant should not be permitted to request trial delays and then cite those delays as supporting evidence that his due process rights have been violated.

With that in mind, the government points out that the prosecution has taken affirmative steps to ready the case for trial, and the defense has sought to delay it. When Mr. Balazs requested the appointment of a second attorney to represent Defendant Allison (ECF 29), the government filed a notice of non-opposition two days later (ECF 30), after which Mr. Knapp was appointed as co-counsel. After providing initial discovery to counsel for Defendant Allison, the government provided defense counsel a discovery index and met with counsel to walk them through the discovery materials. Before the first status conference, government counsel met with Defendant Allison's counsel to confer regarding CIPA deadlines and a trial date. Counsel for Defendant Allison asked the government not to request CIPA deadlines and to request a further status hearing in lieu of a trial date, noting that the defense was not in any hurry to go to trial. The government casts no aspersions and takes defense counsel at their word that they need the extra time to prepare for trial, but respectfully submits that releasing Defendant Allison, notwithstanding his danger to the community and risk of flight, on the basis that his attorneys have requested pretrial delays, furthers neither due process nor the interest of justice.

**CONCLUSION**

For the reasons set forth in the government's Motion for Detention and this Opposition, Defendant Allison, if released, would pose an unacceptably high risk of flight and a grave danger to the community—risks that no condition or combination of conditions can reasonably mitigate. More specifically, Defendant Allison poses a serious flight risk based on his sentencing exposure, his minimal ties to his community, and his extensive ties to a domestic and international network of terrorists. Because Defendant Allison is charged with conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A (Count 15), there is a rebuttable presumption of detention under § 3142(e)(3)(C). That presumption of detention is reinforced by the § 3142(g) factors, each of which weighs in favor of detention. First, as for the "nature and circumstances of the offense[s] charged," § 3142(g)(1), Defendant Allison is charged with soliciting bias-motivated mass-shootings, political assassinations, and terrorist attacks on critical infrastructure—serious crimes that warrant detention to protect public safety and national security—as well as conspiring to provide material support to terrorists, an "extremely serious" crime that "weigh[s] strongly in favor" of detention. *Hir*, 517 F.3d at 1090. Second, "the weight of the evidence against" Defendant Allison is strong: he admitted to federal agents that they had the right guy; the charges are supported by reliable evidence; and his First Amendment defenses are undercut by precedent. § 3142(g)(2). Third, Defendant Allison's "history and characteristics," § 3142(g)(3), likewise weigh in favor of detention. He is an unapologetic white supremacist who has worked for years to solicit like-minded extremists to commit bias-motivated mass murder, political assassinations, and terrorist attacks on critical infrastructure. █████████████████████████████████████████████████████████████████████████████████████████████████

██████ Fourth, the release of Defendant Allison would pose several distinct and compelling dangers to the community, under § 3142(g)(4), that no conditions of release could reasonably mitigate: (A) he would pose a danger to communities all over the world by continuing to provide material support to terrorists and soliciting bias-motivated mass-murder, political assassinations, and terrorist attacks on critical infrastructure; (B) he would pose a danger to people he perceives to be government informants and undercover agents by attempting to retaliate against them; and (C) he would pose a danger to any law enforcement officers called upon to execute arrest warrants against him—officers at risk of being

ambushed by a committed terrorist who has advised other members of the Terrorgram Collective facing arrest to "go down fucking shooting." For those reasons, the United States respectfully submits that Defendant Allison should be detained pending trial.

MICHELE BECKWITH  
Acting United States Attorney  
Eastern District of California  

/s/ Robert Abendroth  
ROBERT ABENDROTH  
Assistant U.S. Attorney  

KATHLEEN WOLFE  
Acting AAG  
Civil Rights Division  

/s/ Christopher J. Perras  
CHRISTOPHER J. PERRAS  
Special Litigation Counsel  

SUE BAI  
Supervisory Official  
National Security Division  

/s/ Jacob Warren  
JACOB WARREN  
Trial Attorney