# EXHIBIT A

# THE IMPACT OF CRIMINAL JUSTICE ACT PAYMENT DELAYS

A Report from the National Association of Criminal Defense Lawyers



Copyright © 2025 National Association of Criminal Defense Lawyers

This work is licensed under the Creative Commons Attribution-NonCommercial-NoDerivatives 4.0 International License. To view a copy of this license, visit **https://creativecommons.org/licenses/by-nc-nd/4.0/**. It may be reproduced, provided that no charge is imposed, and the National Association of Criminal Defense Lawyers (NACDL) is acknowledged as the original publishers and the copyright holders. For any other form of reproduction, please contact NACDL for permission.



For more information contact:



**National Association of Criminal Defense Lawyers®**

1660 L Street NW, 12th Floor, Washington, DC 20036
Phone 202-872-8600
**NACDL.org**

# THE IMPACT OF CRIMINAL JUSTICE ACT PAYMENT DELAYS

## A Report from the National Association of Criminal Defense Lawyers

### September 22, 2025

One of the hallmarks of the American adversarial system is the belief that a fair fight, waged by skilled advocates promotes accurate, just, and reliable outcomes. Our legal system is more credible, effective, and accurate when there is a robust defense.

On July 3rd, with nearly three months remaining in the fiscal year, the government ran out of money to pay CJA Panel members for their work. Despite repeated warnings, Congress's decision earlier this year to approve an FY25 spending bill that froze funding for the judicial branch at 2024 levels left the federal public defense budget woefully short of its identified needs. In addition to perpetuating the federal defenders' hiring freeze, this decision meant that hundreds of lawyers, investigators, social workers, paralegals, experts, and interpreters appointed by the court to federal criminal cases would not get paid for the work they had done.

Currently, over 90% of federal cases are handled by public defense lawyers.[1] While many of those cases will be handled by a public defender,[2] every one of the 94 federal districts also relies upon private lawyers who accept court appointments as members of their district's CJA Panel. CJA Panel attorneys help provide representation when the public defender's office has conflicts, such as multi-defendant cases or when a witness is cooperating with the government.

Unlike salaried public defenders, CJA Panel members work on the promise from the federal government that they will be paid, at a statutorily set rate, for their work. Unless the case has been approved for interim billing, payment is made only after the case has concluded and a voucher is submitted, reviewed, and approved by the court. This typically means that a CJA Panel member may work for months or more on a case before they receive any compensation for it.

The suspension is not only impacting CJA Panel attorneys, but the investigators, experts, social workers, interpreters, and other professionals the court appoints to support these cases, as they too have been unpaid since at least early July.

To understand the breadth and depth of the impact the suspension of payments has had, the National Association of Criminal Defense Lawyers reached out to Panel members across the country and asked them to complete a short survey and share their experiences. By September 19th, we had received

---

1. **"Funding Crisis Leaves Defense Lawyers Working Without Pay,"** Administrative Office of the U.S. Courts, July 15, 2025.

2. Every district except the Southern District of Georgia and the Eastern District of Kentucky has a Federal or Community Defender Office. The two jurisdictions without a Federal or Community Defender rely exclusively on CJA Panel Attorneys to provide representation.

responses from 132 attorneys, paralegals, investigators, and other professionals representing every federal circuit and nearly every state.



Below are excerpts from some of the stories they shared. While not everyone had the same experiences, there were consistent themes describing the financial, professional, and personal toll of not being paid for their work. They expressed fear and anxiety over trying to make ends meet in their offices and their homes; anger and frustration as they worked in courtrooms alongside judges, prosecutors, probation officers and court staff who were all being compensated; and ongoing commitment to their work as they continue to serve their clients, tempered with the reality that they may not be able to do this work in the future.

*"As a small business owner, this shortfall has had a devastating impact on me, my business, and the Service Providers I rely on to do this vital work. On June 25, I made the difficult decision to stop accepting appointments in [one district] and accept only 2 appointments in [another].* **I simply cannot take on new cases without compensation.** *It will be difficult enough to continue working on cases to which I have already been appointed. The increase in prosecutions at the southern border has contributed to an unprecedented demand for CJA Panel Attorneys and Service Providers, especially our interpreters. I am owed over $55,000 for work completed on CJA cases."*

— *Attorney (Texas)*

# SMALL BUSINESSES IN CRISIS

Overwhelmingly CJA Panel work is handled by solo practitioners or small firms with only a few employees. Of the 125 respondents who shared information about their firms, over 98% are small businesses, employing 5 or fewer people.

| FIRM SIZE | NUMBER OF RESPONDENTS (N = 125) (PERCENTAGE) |
|---|---|
| SOLO PRACTICE | 99 (79.2%) |
| 2 TO 5 EMPLOYEES | 24 (19.2%) |
| 6 TO 10 EMPLOYEES | 1 (0.8 %) |
| 11 TO 20 EMPLOYEES | 1 (0.8%) |

Not a single respondent reported working for a firm with more than 20 employees.

Several individuals shared that the suspension of payments has prevented them from making payroll, forcing difficult choices and leading to staff layoffs.

> *"In order to make my payroll last month, I had to contribute personal funds so my staff could get their paychecks without CJA money coming in."*
>
> *— Attorney (Colorado)*

> *"I have had to let staff go, gutting the foundation of my practice. I am exhausted, drowning in debt, and staring down the collapse of everything I have built — simply because I have been required to keep working for free."*
>
> *— Attorney (New Mexico)*

> *"I am the sole attorney in my office and I was responsible for two employees. Because of the financial hardship to my practice, I had to let go of one of my employees over the suspended payments. I have not received payment from US Courts since May 2025."*
>
> *— Attorney (Texas)*

Many have taken out loans (incurring interest they will not recoup), incurred large credit card debt, or depleted their retirement funds.

> "Due to the shortfall, I have been forced to fund my business using credit cards which are rapidly close to being maxed. Paying bills, both business and personal, has me stretched thin to the point **I have to choose which bills I can let slide and which ones must be paid**."
>
> — *Investigator (New Mexico)*

> "I have had to take out a HELOC to cover the shortfall in income resulting from the suspension of payments. Although I will eventually receive those payments, that will not make up for the interest I will have paid on the loan."
>
> — *Attorney (Maryland)*

Others are having to turn to other work to make ends meet.

> "To support my family, especially with tuition and other fees for three children in college, I have had to take out loans. . . To further ensure I can meet my family's daily financial needs, **I have also been driving for Uber and Lyft to earn immediate income.**"
>
> — *Paralegal (California)*

Many are struggling to stay afloat not only professionally, but personally.

> "I am the sole financial support for my husband and our three children. For months now, my family has been living off borrowed money. Every credit card is nearly maxed. I now owe more than $20,000 just to keep us barely surviving. We are at the point of choosing which bills to pay and which to ignore. **I carry the weight of fear every day that we will not make it through this**."
>
> — *Attorney (Texas)*

> "I have to travel to several jails to visit clients and paid out of pocket gasoline and lunch. **I can't cover my expenses and mortgage. My son had a surgery with no insurance**. Used my credit card."
>
> — *Interpreter (New Mexico)*

Several noted that the timing of the delay is especially problematic, as they have federal tax payments due but no funds with which to pay them.

> *"The impact is very simple: I can't pay my bills. . . . As of right now, I'm owed somewhere around $30,000. That's a big deal for a small town attorney in a solo practice. To make matters even worse, **the same federal government that is refusing to pay in a timely manner will be insisting that I pay THEM on October 15, when my taxes are due. Until I get paid, I don't have the money to do that.**"*
>
> — *Attorney (Texas)*

Many report they are owed tens of thousands of dollars, with additional submissions for payment that have not even been processed yet. They will not receive interest on the money they are owed.

> *"Before the 'shutdown' period began, I submitted vouchers totaling more than $80k that have not been paid."*
>
> — *Attorney (New York)*

* *"I am owed **over $55,000** for work completed on CJA cases."* — *Attorney (Texas)*

* *"I have **around $40,000** in unpaid but approved vouchers."* — *Attorney (Missouri)*

* *"The suspension of payments has frozen **over $9,000** for which payment normally [would] have been made months ago."* — *Attorney (New York)*

* *"I am **owed $6,000** in voucher payments."* — *Investigator (New Mexico)*

* *"This year I am currently owed **just under $15,000**."* — *Attorney (Ohio)*

* *"I had a voucher approved for over $100,000 for a one-month trial that I had last year. The voucher was approved in early July [but was not paid out before] . . . the money ran out. . . . With other approved vouchers that have not been paid, I am awaiting **over $150,000**."* — *Attorney (Pennsylvania)*

# IMPACT ON CASES, CLIENTS, AND COURTS

The suspension of payments has a wide ripple effect. Some Panel members describe having to stop work on cases because they can no longer afford to absorb the costs.

> *"I have numerous cases in [a geographically large state]. Several require travel in some manner, either overnight or for several nights. **I have had to postpone all such travel as I cannot afford to advance expenses** for lodging, rental car, etc. **This is causing a delay in many of my cases.**"*
>
> — *Investigator (California)*

> *"I am currently fronting the bill for all travel, expenses, and my hours. It is **unsustainable** and I am not sure if I can even make it through the next month."*
>
> — *Mitigation Specialist (Virginia)*

Respondents also described difficulties securing investigators and experts to take cases. This, in turn, is causing cases to be continued, delaying finality for the accused, but also delaying closure for victims and witnesses. This will likely also have longer term impacts on court dockets as case backlogs start to grow.

> *"As expert witnesses, the CJA payment suspension means that my partner and I are paying our employees out of our own pocket for their time working on these cases. And then we're not getting paid. Already **we have put off any work on CJA cases until the payment suspension ends.** If this problem is not solved for the next fiscal year (meaning full funding for expected expenditures in the next fiscal year), we will not take any new CJA cases."*
>
> — *Expert (New Mexico)*

> *"I have client ready to be sentenced, but one disputed issue remains for the court to decide at sentencing in order to determine the base offense level. I need an expert witness to testify at that sentencing hearing, but the witness will not do so unless and until funding has been restored. **The sentencing hearing has already been scheduled once and continued for this issue. Consequently, the client is stuck in a county jail, rather than being moved into the BOP.**"*
>
> — *Attorney (North Carolina)*

> "There are no interpreters available in the central district *[d]elaying cases* where clients are out of custody and additional investigation and/or experts are required because of vendor payment issues."
>
> — *Attorney (California)*

> "In a few cases, I have asked courts for *90 day extensions so that I can work on retained cases rather than CJA cases while the payments are suspended.*"
>
> — *Attorney (Texas)*

No segment of the Panel was immune from harm. Both newly appointed attorneys and those with decades of experience all weighed in with the devastation payment deferrals have had on themselves, their practices, and their cases.

| YEARS ON THE CJA PANEL | PERCENTAGE OF SURVEY RESPONDENTS (N=127) |
|---|---|
| 5 YEARS OR LESS | 23.6% |
| 6 TO 10 YEARS | 20.4% |
| 11 TO 20 YEARS | 26.8% |
| 21 YEARS OR MORE | 29.1% |

> "On June 25, I made the difficult decision to stop accepting appointments in [one district] and have only accepted 2 appointments in [another] since July 3. *I simply cannot take on new cases without compensation.* It will be difficult enough to continue working on cases to which I have already been appointed. . . . *I've sought (and been granted) continuances of trial and other deadlines* because I cannot devote the time needed to adequately prepare while not being paid. It is *also difficult to find Service Providers* who will work when they have no assurances of when they will be compensated. I've had to *pivot to other areas of practice for income.* . . . Without competent attorneys to accept these cases and qualified experts, investigators, interpreters, paralegals, mitigation specialists, and other service providers to assist, who will protect the constitutional rights of the accused? The danger of their rights being violated due to delays caused by underfunding, as well as the risk of losing qualified individuals to work on these cases, *should be of utmost concern for everyone.*"
>
> — *Attorney (Texas)*

Several shared they have reduced or even stopped taking CJA cases and many more were on the precipice of doing the same.

> *"The suspension has forced me to stop taking appointments until payments begin again. Every hour I spend on a CJA case means I lose double as I cannot bill on other regular cases for that time.* ***I cannot afford to do that any longer.****"*
>
> — *Attorney (Massachusetts)*

> *"I am a paralegal that runs my own business. Over half of my work is with CJA.* ***I am unable to pay my rent, electric, phone bills, etc. due to this lack of funding*** *to pay me. I am a single mom trying to take care of my family alone. I went to school to become a paralegal and will need to pay my* ***student loan payments*** *which I cannot meet due to this lack of funding that has kept me from being paid.* ***I work with CJA because I strongly believe in our country's constitution. I am going to be forced to reduce my hours with CJA if I cannot get paid for my work regularly****."*
>
> — *Paralegal (Alaska)*

> *"I have turned down several opportunities to accept federal cases, taking state cases instead because I will receive more timely payment."*
>
> — *Attorney (New York)*

> *"I have not taken any new CJA appointments since the funding shortfall and am* ***unsure if I will continue to do so in the future****."*
>
> — *Attorney (Oregon)*

Others have made clear that they do not intend to return to this work even after payments resume.

> *"I am a solo practitioner. I have been unable to pay myself a salary since July. Further,* ***I have pivoted away from criminal law and toward a different type of law to avoid this situation in the future****."*
>
> — *Attorney (Ohio)*

> ***"I will not work for the CJA anymore."***
>
> — *Attorney (Kansas)*

# CONTINUING THE WORK WITHOUT PAYMENT

Even though they are not getting paid, many of these professionals continue their work, personally paying for case expenses further deepening their debt.

> *"I have had to pay out-of-pocket for transcripts and investigative services. . . . .I am preparing for a retrial and the **Court has indicated if we want the transcripts from the first trial we will have to order them. I cannot absorb the several thousand dollars that would cost**."*
>
> *— Attorney (Pennsylvania)*

An attorney cannot stop representing a client simply because payment is not forthcoming. They have an ethical and professional obligation to their client and a commitment to the court to remain in the case. Every day they appear in places where they alone are being asked to work without the pay everyone else is receiving.

> *"It is . . . such **a stinging slap in the face** to be practicing in a border district with increased prosecutions for illegal entry cases, and the massive appropriations for DHS and the prosecution in the billions, but not even a small part of that is allocated to the defense."*
>
> *— Attorney (California)*

> *"While I strongly believe in indigent defense, I don't believe it's fair to expect CJA Attorneys and Service Providers to **shoulder this burden alone**."*
>
> *— Attorney (Texas)*

# CONCLUSION

Delays in payment have both immediate and long-term consequences for our legal system and our communities. They erode the fundamental trust that people should have in their government and undermine the belief that our legal system will reach fair, just, and accurate decisions.

> *"I work exclusively from home and exclusively on appellate CJA appointments. In part this is because I have stage IV metastatic breast cancer that has spread to my bones. My treatment suppresses my immune system and so I can't just "get another job" nor can I work on cases which require me to go out in public. The suspension of CJA payments is devastating to me. I can't pay my mortgage or my health insurance. . . I am about to run out of my six-months emergency savings and will soon have to start withdrawing from my 401k. I had hoped to live another ten years or more despite having terminal cancer, but now I have to worry that I won't have enough money saved to last that long. The stress this is causing me is certainly bad for my physical health, as well as my mental health. I continue to accept CJA appointments because at least as long as I am working, I know I am doing something good and relevant to help other people, and I can hope that someday I will get paid for my work."*
>
> — *Attorney (Texas)*

The time to act is now! *Urge your member of Congress* to support full funding for the federal public defense system.

**About NACDL:** The National Association of Criminal Defense Lawyers is the preeminent organization advancing the mission of the nation's criminal defense bar to ensure the proper and fair administration of justice and safeguard due process for all persons accused of crime. Founded in 1958, NACDL has over 10,000 direct members and thousands more who are members of its 90 state, local and international affiliates. Its membership includes private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges committed to preserving fairness and promoting a rational and humane criminal justice system.



National Association of Criminal Defense Lawyers
1660 L St NW, 12th Floor, Washington, DC 20036

**NACDL.org**